UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:20-CV-00004-GNS-HBB

MATTHEW CUSHMAN                                                           PLAINTIFF

v.

MONROE COUNTY, RICKY RICHARDSON,
individually and in his official capacity; and
BARREN COUNTY                                                            DEFENDANTS

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is before the Court on Motions for Summary Judgment filed, respectively, by Defendant Barren County (DN 27), and by Defendants Monroe County and Ricky Richardson ("Richardson") (DN 31). These motions are ripe for adjudication. For the reasons that follow, Barren County's motion is **GRANTED**, and Monroe County and Richardson's motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.      <u>BACKGROUND</u>

Plaintiff Matthew Cushman ("Cushman") claims that his constitutional rights were violated when he was unable to obtain an ankle monitor which was required as a condition for his release from jail on bond. Cushman filed this action asserting five claims against the Defendants: (1) deprivation of liberty and due process under 42 U.S.C. § 1983; (2) violation of his Sixth Amendment right to counsel under 42 U.S.C. § 1983; (3) infliction of emotional distress; (4) failure to train; and (5) failure to supervise.[1] (Compl. ¶¶ 30-48, DN-1). Barren County and separately Monroe County and Richardson moved for summary judgment on all counts (DN 27, 31).

---

[1] The last three claims are asserted under state law.

1

Cushman was arrested in Monroe County on January 4, 2019, for terroristic threatening and menacing. (Monroe Cnty. Defs.' Mot. Summ. J. Ex. 1, DN 31-2). Cushman was transported to the Barren County Detention Center ("BCDC") where Monroe County inmates are housed. (Monroe Cnty. Defs.' Mem. Supp. Mot. Summ. J. 2, DN 31-1). Cushman was placed in a cell that permitted collect calls as well as regular calls with a prepaid phone card and Cushman used the phone throughout his time at BCDC. (Bennett Dep. 12:1-16, 51:10-52:10, Sept. 11, 2020, DN 20). Cushman claims that upon his arrival at BCDC he asked to call an attorney, but his request was denied. (Cushman Dep. 85:13-86:4, 87:1-5, Aug. 31, 2020, DN 18). Cushman also alleges that he was only allowed to call family, even though jail policy was to allow inmates to call any person of their choosing. (Cushman Dep. 86:8-87:5; Bennett Dep. 14:22-15:9). The call logs from BCDC show that after being arrested on January 4, Cushman made his first two calls on January 5 and then continued to make calls almost every day for the period he was in BCDC. (Barren Cnty. Def.'s Mem. Supp. Mot. Summ. J. Ex. 6, DN 27-7).

On January 8, 2019, Cushman entered his initial appearance in Monroe District Court, which ordered him released on his own recognizance conditioned upon placement of an electronic ankle monitor. (Order 1-2, DN 27-5 [hereafter State Court Order]). Cushman claims that as he was being transported from his court appearance back to jail, Monroe County Jailer Doyle Fox ("Fox") told him that Richardson was the person who handled ankle monitors for Monroe County. (Cushman Dep. 103:22-104:4, 109:24-112:18). Fox said Richardson would visit Cushman in the jail later that day to make arrangements for payment for the ankle monitor. (Cushman Dep. 129:17-130:8). According to Fox, "[m]ost of the time, the judge will say, you see Ricky Richardson, you know. He's the one—he puts them on. He's the one that puts them on. He'll go to the jail and put them on over there." (Fox Dep. 14:14-21 Sept. 11, 2020, DN 21). Fox also

testified that Richardson sometimes applies ankle monitors at the courthouse by taking an inmate to an office there.  (Fox Dep. 14:22-25).

Richardson is a part-time deputy and chief bailiff with the Monroe County Sheriff's Department who supervises court proceedings at the Monroe County Justice Center and oversees court security.  (Richardson Dep. 18:8-21:11, Sept. 11, 2020, DN 19).  He is in the courtroom for proceedings, wears a sheriff's uniform, and carries a weapon.  (Richardson Dep. 18:2-13, 20:11-13).  Richardson also runs an ankle monitor business called R&R Home Monitoring which provides services in several Kentucky counties, including Monroe County, but does not have a contract with Monroe County or any government entity.  (Richardson Dep. 22:1-8, 23:20-22, 24:9-22).  According to Richardson, he conducts his business after he gets off work with Monroe County and he has total autonomy over to whom he provides ankle monitors.  (Richardson Dep. 26:7-8, 33:12).  According to Monroe County Sheriff Roger Dale Ford ("Ford"), the county has no procedure to avoid confusing inmates about whether the ankle monitoring business is associated with Monroe County.  (Ford Dep. 28:11-29:20, Aug. 31, 2020, DN 22).  Ford also testified that there have never been any complaints about Richardson's ankle monitoring business.  (Ford Dep. 29:23-25).

Richardson testified that during Cushman's initial appearance he gave Cushman his telephone number and told him "I do ankle monitor.  If you need me, call me."  (Richardson Dep. 28:21-29:6).  Richardson explained that he is usually contacted by a family member who pays for the ankle monitor; he will then go to the jail to fit the monitor, which is not difficult because he has "been in and out of that jail for lots and lots of years, being the deputy jailer."  (Richardson Dep. 26:15-24).  When there is a conflict of interest, Richardson refers inmates to a different ankle monitor provider.  (Richardson Dep. 27:20-28:10).  Cushman was not given a list of any other

ankle monitor providers and there is no evidence Monroe County provides any such list.  (Ford Dep. 30:11-14).

After not hearing from Richardson, Cushman filed an Inmate Request form with BCDC at 10:00 PM on January 8th explaining that he needed an ankle monitor to be released and had the funds to pay for it.  (DN 18, PageID # 192).  The jailer responded promptly that Cushman could not be released until "they come put your ankle monitor on."   (DN 18, PageID # 192). Subsequently a friend of Cushman, Ronald Finn ("Finn"), met with Richardson to pay for the ankle monitor.  (Finn Decl. ¶ 3, DN 40-6).  Richardson allegedly told Finn he would not provide the monitor because Cushman lives in Tennessee and could try to flee, although the court had ordered Cushman to stay out of Kentucky.  (Finn Decl. ¶ 3; State Court Order 1).  Richardson denies that this conversation ever occurred.  (Richardson Dep. 30:22-31:13).

Cushman continued to submit daily requests to Barren County, asking to speak with someone about an ankle monitor.  (DN 18, PageID # 192-209).  At his next court date on January 15, 2019, Cushman explained that he had not been released because Richardson had refused to let him out, at which point Richardson claimed that he had not provided an ankle monitor because the victim's family was trying to pay for it.  (Cushman Dep. 158:10-159:9).  After the hearing, at which Cushman was represented by counsel, Richardson rejected Finn's offer to pay for the monitor and allegedly said that Cushman should have taken a plea deal if he wanted to get out of jail.  (Finn Decl. ¶ 4).

Richardson testified that "I offer an ankle monitoring business.  I was going to do what I was going to do" and that he "wasn't going to break the law by putting an ankle monitor on somebody to where I could help the other side—I'm going to call him the victim—the other side in this."  (Richardson Dep. 36:18-37:11).  He explained that allowing the individuals who

contacted him to pay for the ankle monitor would have violated the judge's bond order because "[t]he victim was standing there with him.  And . . . that was the people that come to me, the victim and his father."  (Richardson Dep. 39:10-25, 33:20-34:3).  Both the victim, Aaron Stewart, and his father, John Stewart, deny speaking to Richardson about an ankle monitor.  (A. Stewart Dep. 12:6-9, Nov. 3, 2020, DN 40-7; J. Stewart Dep. 10:1-9, Nov. 3, 2020, DN 40-8).

BCDC eventually responded to Cushman's complaints stating: "Our orders say you are to be released when the ankle monitor people come and put it on.  We have no control of when he comes.  If there is a reason why the ankle monitor guy isn't coming that is not in our control.  We do not have any authority over what he does or does not do."  (DN 18, PageID # 204).  A report dated January 17, 2019, from another meeting between Cushman and BCDC official states:

> "I, Lt. Smith reviewed the case and observed that inmate Cushman was to be released on a "ROR" bond with ankle monitor hook up before release.  I, Lt. Smith called Monroe Co. and spoke with clerk Kim Hagan.  Clerk Hagan informed me, Lt. Smith that on 1/15/2019 while in court "Ricky Richardson" who issues the ankle monitor informed the inmate, his attorney and the judge that he was not comfortable issuing the monitor because the victims [sic] family was the ones wanting to pay cash for the ankle monitoring service."

(DN 18, PageID # 248).

Cushman eventually was released on January 19, 2019, after obtaining an ankle monitor from another provider.  (Richardson Dep. 33:22-23; Cushman Dep. 224:4-22).  The charges against Cushman were dropped on March 5, 2019.  (Cushman Dep. 183:4-7).

## II.     JURISDICTION

Jurisdiction for the federal law claims is based on federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This Court has jurisdiction over the state law claims through supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

### III.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support an essential element of the nonmoving party's case for which he has the burden of proof. *Id.* Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id.* If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

#### A.    42 U.S.C. § 1983 Claims

"Section 1983 creates no substantive rights but merely provides remedies for deprivations of rights established elsewhere." *Edwards v. Warren Cnty. Reg'l Jail*, No. 1:17-CV-P137-GNS, 2018 WL 445115, at *2 (W.D. Ky. Jan. 16, 2018) (quoting *Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001)). A successful 42 U.S.C. § 1983 claim requires that two elements be proven: (1) a "deprivation of a right secured by the Constitution or laws of the United States"; and (2) the deprivation was "caused by a person acting under color of state law." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008) (citation omitted). Cushman asserts Section 1983 claims against Richardson, Barren County, and Monroe County for deprivation of his liberty and due process of law. (Compl. ¶¶ 30-35). Cushman asserts an

additional Section 1983 claim against Barren County for violation of his Sixth Amendment right to counsel.  (Compl. ¶¶ 36-39).

### 1.     *Sovereign Immunity*

As a preliminary matter, Cushman's 42 U.S.C. § 1983 claims under the Fifth, Sixth and Fourteenth Amendments are not barred by sovereign immunity.  Sovereign immunity does not protect counties and their agents from federal law claims.  *Doe v. Patton*, 381 F. Supp. 2d 595, 602 (E.D. Ky. 2005), *aff'd sub nom*. *Doe v. Magoffin Cnty. Fiscal Ct.*, 174 F. App'x 962 (6th Cir. 2006) (citations omitted).  This is because "[s]tates cannot abrogate § 1983 liability in federal courts simply by extending sovereign immunity through state common law." *Id.* (citing *Howlett v. Rose*, 496 U.S. 356, 358 (1990)).  Since the Eleventh Amendment does not protect state actors in their individual capacities, none of Cushman's Section 1983 claims under the Fifth, Sixth and Fourteenth Amendments are barred.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

### 2.     *Monroe County (Fourteenth Amendment)*

A municipality cannot be liable for an employee's alleged wrongdoings based on the doctrine of respondeat superior.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 436, 691 (1978).  Instead, Cushman must prove that any violation occurred pursuant to a policy or custom of Monroe County or Barren County.  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  A county may be held liable for a custom "even though such custom has not received formal approval through the body's official decision making channels." *Trezevant v. Tampa*, 741 F.2d 336, 340 (11th Cir. 1984) (citation omitted).  To prevail under this theory, Cushman must "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy." *Alkrie v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (citation omitted).  The absence of a policy can support claims under Section 1983 if the plaintiff

can demonstrate that the lack of policy resulted from "deliberate indifference" on behalf of the municipality. *Veanus v. Northampton Cnty. Prison*, 238 F. App'x 753, 755 (3d Cir. 2007).

Cushman contends that Monroe County does not provide a list of ankle monitoring services and allowed Richardson to be the sole provider of the monitors, which led to the violation of Cushman's constitutional rights. (Pl.'s Resp. Defs.' Mot. Summ. J. 4-5; Ford Dep. 30:11-14). Cushman must show that Monroe County acted with deliberate indifference, which "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 737 (6th Cir. 2015) (internal quotation marks omitted) (citation omitted). This typically "requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 815 (6th Cir. 2005) (citation omitted). A plaintiff must also prove that "the municipal policies and practices directly caused the constitutional violation." *Id.* (citation omitted).

Cushman has presented no evidence that Monroe County acted with deliberate indifference leading to the alleged violation of his constitutional rights. Cushman does not point to any previous examples of complaints or constitutional violations resulting from Monroe County delegating the ankle monitor authority to Richardson. In fact, Sheriff Ford testified that there had never been any previous complaints about Richardson's management of the ankle monitoring service. (Ford Dep. 29:23-25). Furthermore, it cannot be said that Monroe County acted with disregard for a "known or obvious consequence" simply by putting Richardson in charge of the ankle monitors. If that were the case, then any failure by a contractor or employee to perform assigned duties would be a "known or obvious consequence." *Shadrick*, 805 F.3d at 737. Absent some proof that Monroe

County had reason to know that Richardson's provision of monitoring services was problematic before this incident, Cushman's Section 1983 claim against Monroe County must be dismissed.

### 3.     *Barren County (Fourteenth Amendment)*

The crux of Cushman's claim against Barren County is that it violated Cushman's due process rights by failing to help him acquire an ankle monitor.  Barren County, however, argues that BCDC promptly investigated and reasonably responded to Cushman's complaints while he was in its custody.  (Barren Cnty.'s Mem. Supp. Mot. Summ. J. 7).  When Cushman complained about not having received an ankle monitor, BCDC responded promptly, far sooner than the 10-day period required by BCDC procedure.  (DN 27-3, PageID # 299; (DN 18, PageID # 192).  For instance, BCDC responded to Cushman's first inmate request form within roughly an hour.  (DN 18, PageID # 192).  Later, a BCDC representative also suggested that Cushman reach out to his attorney about getting an ankle monitor.  (DN 18, PageID # 248).

Cushman presents no evidence that Barren County acted in a way that deprived him of his due process rights.  To succeed on a Section 1983 claim against a municipality, "the plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).  Cushman, however, is not able to present any evidence that Barren County was the "moving force" behind his alleged injury.  *Id*.  To the contrary, Barren County was following the Monroe County court order by not releasing Cushman without an ankle monitor, and also took reasonable steps to address Cushman's complaints about his inability to obtain an ankle monitor.  As noted above, the jail personnel met with Cushman and explained that they had contacted the Monroe District Court Clerk who reported that Cushman's attorney and the presiding judge were aware of this situation.  (Cushman Dep. 125:17-22; DN 18, PageID # 210).  Barren County then

suggested that Cushman speak to his attorney.  (DN 18, PageID # 210). Therefore, because Barren County was not the "moving force" behind Cushman's injury stemming from his inability to obtain an ankle monitor and was acting pursuant to a court order, Cushman's Fourth Amendment Section 1983 claim against Barren County is dismissed.

### 4.   *Barren County (Sixth Amendment)*

"To prevail on a § 1983 claim for a violation of the Sixth Amendment's right to counsel, made applicable to the states by the Fourteenth Amendment, Plaintiff must establish an intrusion into an attorney-client communication and some prejudice to him." *Ickes v. Woosley*, No. 1:17-CV-P30-GNS, 2017 WL 1205070, at *2 (W.D. Ky. Mar. 30, 2017) (citation omitted).  Cushman has not shown prejudice from any limitations Barren County placed on communications with his attorney, and thus summary judgment on this claim is appropriate.

After his arrest, Cushman's initial hearing was held on January 8 at which time he was appointed counsel.  (Cushman Dep. 103:11-104:13).  Cushman has not shown that an attorney could have obtained his release from jail before that hearing took place.  Likewise, both before and after the initial hearing, Cushman did in fact make calls from the jail.  (Defs.' Mem. Supp. Mot. Summ. J. Ex. 6, DN 27-7).  During his deposition, Cushman admitted that he was able to make calls to his attorney after receiving his phone card on January 10.  (Cushman Dep. 145:14-147:19).  Cushman purchased calling cards on his commissary account and has not shown any reason why he could not have purchased a calling card on January 7 when he purchased food, as well as envelopes and stamps.  (Def. Barren Cnty.'s Mot. Summ. J. Ex. 5, DN 27-6).  Thus, by January 7—before Cushman's initial appearance on January 8—Cushman had available means to correspond or call an attorney via a calling card which could have been purchased through his commissary account.  (Def. Barren Cnty.'s Mot. Summ. J. 3, Ex. 5, DN 27-6).

10

The Sixth Amendment is satisfied when an inmate has "meaningful access to his attorney . . . ." *Cesal v. Bureau of Prisons*, No. 04-CV-281-DLB, 2006 WL 2803057, at *4 (E.D. Ky. Sept. 28, 2006) (citation omitted).  "Limited access to telephone calls, however, is not a constitutional violation so long as inmates can communicate with their counsel in writing or in person by visits." *Rouse v. Simpson*, No. 5:08CV-P1234-R, 2009 WL 5103628, at *3 (W.D. Ky. Dec. 17, 2009) (internal quotation marks omitted) (citation omitted).  This Court has regularly dismissed right to counsel claims where the inmate fails to allege that he was not allowed to contact his attorney by other means such as jail visits.  *Rouse*, 2009 WL 5103628, at *3; *White v. Blue*, No. 4:15-CV-P100-JHM, 2015 WL 9244491 (W.D. Ky. Dec. 17, 2015).  Not only did Cushman have stamps and envelopes, but his attorney made visits to the jail during Cushman's period of incarceration in addition to interactions with counsel during the hearings on January 8 and 15.  (Cushman Dep. 103:11-104:13, 158:10-159:9, 178:4-7, 189:3-5).

Further, Cushman is not able to prove any prejudice to himself because of any alleged violation of his Sixth Amendment rights.  The charges against him were dropped on March 5, 2019, and Cushman does not name any other injury arising from the alleged violation.  (Cushman Dep. 183:4-7).  Cushman had a jail phone and calling card; he had envelopes and stamps; and he communicated with and had personal visits with his attorney while in the jail.  Under these circumstances, Cushman has failed to establish a violation of his 6th amendment right to counsel.

## 5.      *Richardson in his Official Capacity*

Claims against Richardson in his official capacity are to be treated as against the entity he worked for, Monroe County, and therefore are dismissed in line with the Monroe County analysis above.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  (citation omitted)).

11

**6.** ***Richardson in his Individual Capacity***

A successful 42 U.S.C. § 1983 claim requires that two elements be proven:  (1) there is "deprivation of a right secured by the Constitution or laws of the United States"; and (2) the deprivation was "caused by a person acting under color of state law."  *Hunt*, 542 F.3d at 534 (citation omitted).  Cushman alleges that Richardson violated his constitutional right to a timely release when Richardson failed to provide him with pretrial ankle monitoring services.  (Compl. ¶¶ 30-35).

**a.**     **Constitutional Right**

The first element of a Section 1983 claim requires "deprivation of a right secured by the Constitution or laws of the United States . . . ."  *Hunt*, 542 F.3d at 534 (citation omitted). Richardson argues that Cushman has not established a violation of a Constitutional right because the court order allowing Cushman's release with an ankle monitor did not explicitly require Richardson to provide an ankle monitor.  (Monroe Cnty. Defs.' Mem. Supp. Mot. Summ. J. 7; Barren Cnty.'s Mem. Supp. Mot. Summ. J. 6).  The issue, however, is not whether the order required Cushman's release, but instead whether Richardson actively prevented Cushman from meeting the requirements for his release.

Cushman cites *Hurm v. Curry*, No. 4:10-CV-00086, 2011 WL 2940698 (W.D. Ky. July 19, 2011), in which this Court found that the complaint sufficiently pleaded a constitutionally protected right under Section 1983, alleging the plaintiff's family attempted to pay his bail but was not permitted to do so.  *Id.* at *1-3.  The Court explained the claim of the defendants "unjustly caus[ing] additional and unreasonable days of incarceration" could infringe on the defendant's liberty interest and violate the Due Process Clause.  *Id.* at *3.  Richardson points to *Thompson v. Jackson*, No. 1:16-CV-04217, 2018 U.S. Dist. LEXIS 194773 (N.D. Ga. Nov. 15, 2018), to support

12

the contention that conditions of release, such as the posting of a bond, must be met before a jail is obligated to release an inmate. *Id*. at \*22-23. This situation is different, however, because Cushman claims Richardson controlled and interfered with the conditions of his release by withholding placement of an ankle monitor.

Cushman points to proof that his family unsuccessfully attempted to purchase an ankle monitor from Richardson. (Pl.'s Resp. Defs.' Mot. Summ. J. 16; Finn Decl. ¶¶ 1-4). Preventing Cushman from meeting his bond conditions, to the extent Richardson did so, could be equivalent to denying him bail without due process as required by the Fourteenth Amendment. *Curry*, 2011 WL 2940698, at \*3. Therefore, Cushman has established a constitutionally protected right in being released from jail when he was prevented from meeting his bond conditions.

### b.    Color of Law

The second element of a Section 1983 claim requires that the deprivation was "caused by a person acting under color of state law." *Hunt*, 542 F.3d at 534 (citation omitted). Richardson contends that he was not acting under the color of state law when he declined to provide an ankle monitor to Cushman. (Monroe Cnty. Defs.' Mem. Supp. Mot. Summ. J. 7). While the personal acts of a state official are not necessarily under color of law solely because the individual is a state officer, the overall circumstances in this case indicate that Richardson was acting under the color of law when he allegedly refused to provide Cushman with an ankle monitor. *Dorr v. City of Ecorse*, No. 05-73074, 2007 U.S. Dist. LEXIS 6394, at \*46 (E.D. Mich. Jan. 30, 2007).

Two common tests used to determine if an individual is acting under the color of law are the "public function test" and the "nexus test", both of which indicate that Richardson was acting under the color of law. First, the public function test "requires that the private actor exercise powers that are traditionally reserved to the state." *Wittstock v. Mark A. Van Sile, Inc*., 330 F.3d

899, 902 (6th Cir. 2003) (citation omitted). District courts have found that pretrial supervision functions such as providing ankle monitoring services to criminal defendants, are "fundamentally governmental function[s] that [are] traditionally reserved to the states." *Meade v. Bonin*, No. 20-1455, 2020 WL 5311351, at *4 (E.D. La. Sept. 4, 2020) (internal quotation marks omitted) (citation omitted). In *Meade v. Bonin*, the court held that an approved private ankle monitoring company was acting under the color of state law in providing pretrial ankle monitoring services. *Id.* Rejecting the contention that the defendants lacked authority to sanction or penalize prisoners, the court recognized that the defendants' authority to monitor was "granted to it *by the state*" and without such authority, this type of monitoring would likely be a crime. *Id.* (emphasis in original). Likewise, in *Jones v. County of Suffolk*, 164 F. Supp. 3d 388 (E.D.N.Y. 2016), the court found that while a license, funding, or regulation by the government does not make an entity a state actor, the defendant was a state actor where it took on the traditional governmental role of monitoring registered sex offenders. *Id*. at 396-97.

Second, the nexus test "requires that a sufficiently close relationship exist between the state and the private actor (through regulation or by contract) so that private action may be attributable to the state." *Wittstock*, 330 F.3d at 902 (citation omitted). Richardson did not have a written contract with Monroe County, but he did have an arrangement with the county that created a duty for him to provide ankle monitors to inmates. Monroe County gave Richardson access to the jail and represented to inmates that Richardson was the individual in charge of ankle monitors. (Richardson Dep. 26:15-24; 27:20-28:10; Fox Dep. 14:14-21). Richardson seemingly provided all the ankle monitors for Monroe County, unless he deemed a conflict of interest. (Richardson Dep. 27:20-28:10). Even when Richardson had a conflict of interest and did not provide an ankle monitor, he made the referral to an alternate provider. (Richardson Dep. 27:20-28:10). While

there may not have been a written agreement, there was certainly a policy by which Monroe County designated to Richardson the duty to provide inmates with ankle monitors.

In *Amig v. County of Juniata*, 432 F. Supp. 3d 481 (M.D. Pa. 2020), the court found that a private drug testing company could be liable under Section 1983 where a prison outsourced drug testing for inmates to a private company. *Id.* at 487. The court explained that the prison had "a duty to provide a safe environment to its inmates" including a duty to "monitor [its] prison population for illicit drug use." *Id.* The prison could not delegate the duty to monitor drug use to a private party and "absolve inmates of constitutional rights by doing so." *Id.* Likewise, in *West v. Atkins*, 487 U.S. 42 (1988), the Supreme Court found that a physician who provided medical services to prison inmates was acting under the color of law. *Id.* at 55. The Court reasoned that the state "employs physicians, such as respondent, and defers to their professional judgment, in order to fulfill" its duty to provide medical care to inmates. *Id.* Thus, "[b]y virtue of this relationship, effected by state law, [the defendant physician] is authorized and obliged to treat prison inmates, such as [plaintiff]." *Id.*

Cushman had a constitutional right to be released when he was able to meet the conditions of his bond. *See Hurm*, 2011 WL 2940698, at *4. Monroe County, therefore, has a corresponding duty to release inmates when their bond conditions are met. *Id.* This right exists regardless of whether Monroe County releases inmates itself or if it outsources certain conditions of release to a third party. *Amig*, 432 F. Supp. 3d at 487. Cushman has properly alleged that his rights were violated when he was kept in jail solely because he could not obtain an ankle monitor. The issue that arises is, thus, who is responsible for this alleged violation? "[W]hen a governmental entity delegates one of its traditional or 'public functions' to a private entity, the private entity may be held liable under the Constitution with respect to its performance of that function." *Giron v. Corr.*

15

*Corp. of Am.*, 14 F. Supp. 2d 1245, 1250 (D.N.M. 1998).  Like the drug testing company in *Amig,* which was only delegated one portion of the prison's duty to keep inmates safe, Richardson was delegated responsibility for providing inmates with ankle monitors—one part of the overall duty to ensure that inmates were timely released.  *See Hurm*, 2011 WL 2940698, at *4.

Richardson and Monroe County's informal arrangement meets the "sufficiently close relationship" requirement of the nexus test.  *Wittstock*, 330 F.3d at 902 (citation omitted).  Monroe County entrusted its ankle monitor services to Richardson, who reaped the rewards of this arrangement.  The fact that there was not a written agreement does not change the fact that Monroe County functionally delegated to Richardson the responsibility of providing ankle monitors to pre-trial detainees.  Monroe County may have accepted other ankle monitor providers, but none of them received the access and endorsement like Richardson.  (Richardson Dep. 26:15-24; 27:20-28:10).  Therefore, because Richardson was acting as a state actor under both the public function test and the nexus test, Cushman can satisfy the second element of his Fifth and Fourteenth Amendment Section 1983 claims.

### c.    Qualified Immunity

Under federal law, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citation omitted).  To determine whether an individual is entitled to qualified immunity, a court must consider:  (i) whether "based on applicable law and the facts viewed in the light most favorable to the plaintiff, has a violation occurred," and if so, (ii) whether "the constitutional right [was] 'clearly established' at the time of

violation." *Penman v. Correct Care Sols.*, No. 5:18-CV-58-TBR, 2018 WL 6220921, at *8 (W.D. Ky. Nov. 28, 2018) (citation omitted).

Before reaching this two-part test, the court must determine if the defendant is a "government official" potentially protected by qualified immunity. *Rowland v. S. Health Partners, Inc.*, No. 3:18-CV-00033-GFVT-EBA, 2020 WL 4288401, at *3 (E.D. Ky. July 27, 2020), *appeal dismissed*, 4 F.4th 422 (6th Cir. 2021). It is well established that certain government officials such as police officers or sheriff's deputies are entitled to seek qualified immunity. *See United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 479 (6th Cir. 2014); *Enoch v. Hamilton Cnty. Sheriff's Off.*, 818 F. App'x 398, 402-03 (6th Cir. 2020); *Everson v. Leis*, 556 F.3d 484, 494-95 (6th Cir. 2009). If Richardson's ankle monitor business had been part of his duties as a sheriff's deputy, then he certainly would have been entitled to assert a qualified immunity defense. *See United Pet Supply*, 768 F.3d at 479; *Enoch*, 818 F. App'x at 402-03; *Everson*, 556 F.3d at 494-95. At the time of the incident, however, Richardson was operating his private and independent ankle monitor business. Therefore, the Court must determine whether Richardson, as a private party outside the scope of his law enforcement duties, is entitled to seek qualified immunity.

### i.        "Government Official"

A private party is not entitled to assert qualified immunity simply because he acts under the color of state law for the purposes of Section 1983. *McCullum v. Tepe*, 693 F.3d 696, 700 (6th Cir. 2012) (internal citations omitted). Determining whether a private individual acting under the color of state law may assert qualified immunity "demands a fact-intensive analysis." *United Pet Supply*, 768 F.3d at 479. To determine whether an individual is entitled to qualified immunity, a court must consider whether: "(1) there was a firmly rooted history of immunity for similarly

situated parties at common law; and (2) whether granting immunity would be consistent with the history and purpose of § 1983." *Id.* (quoting *McCullum*, 693 F.3d at 700).

The parties have not pointed to any evidence that there is a "firmly rooted tradition of immunity" applicable to pretrial service providers. In *Richardson v. McKnight*, 521 U.S. 399 (1997), the Supreme Court determined that that there was not a firmly rooted tradition of immunity applicable to privately employed prison guards. *Id.* at 405. The Court referenced individuals operating jails in the 18th century and private contractors who were heavily involved in prison management during the 19th century, indicating a history of municipalities outsourcing their prison functions to private parties. *Id.* The Court found no indication that the law gave these private companies or their employees any special immunities from suit. *Id.* at 406. Richardson is a private party to whom a function of the state penal system was delegated. Without any evidence of a tradition of immunity for pretrial service providers, *McKnight* indicates that in the context of private parties functioning in conjunction with the penal system, no such immunity exists. *McKnight*, 521 U.S. at 405.

Next, the Court must consider whether granting qualified immunity to pretrial supervision service providers would be in line with the purpose of the qualified immunity doctrine. *McKnight*, 521 U.S. at 407. "[O]ur analysis hinges on three of § 1983's goals: (1) protecting the public from unwarranted timidity on the part of public officials; (2) ensur[ing] that talented candidates were not deterred by the threat of damages suits from entering public service; and (3) guarding against the distraction from job duties that lawsuits inevitability create." *United Pet Supply*, 768 F.3d at 479 (quoting *McCullum*, 693 F.3d at 704).

"Preventing unwarranted timidity is the most important special government immunity-producing concern." *Id.* at 480 (internal quotation marks omitted) (citation omitted). In *McKnight*,

the Court found that prison guards employed by a private company could not seek qualified immunity because market pressures on private prison corporations alleviated concerns about unwarranted timidity.  *McKnight*, 521 U.S. at 405, 409.  Other factors are whether the private party faces the threat of replacement and whether the private company was closely supervised by the government.  *United Pet Supply*, 768 F.3d at 480.  In this regard, *McKnight* can be contrasted with *Bartell v. Lohiser*, 215 F.3d 550 (6th Cir. 2000), where qualified immunity was available for employees of a private foster-care agency which worked closely with a state agency to create foster-care plans and sought approval from the state agency.  *Id*. at 560.

In this case, there are no concerns of unwarranted timidity that would support qualified immunity for Richardson.  First, the market pressures discussed in *McKnight* are certainly present in this case.  Richardson was granted access to the Monroe County jail and prisoners because of his status as a sheriff's deputy, but he conducted his private ankle monitoring business separate from his regular job duties.  (Richardson Dep. 23:20-22, 24:9-22, 26:7-8, 33:12).  There is no indication that it would be a challenge for Monroe County to find another ankle monitor provider; in fact, other providers are available as demonstrated by Richardson's occasional referrals.  (Richardson Dep. 27:20-28:10).  Second, Richardson's operation of his ankle monitoring business is more in line with *McKnight* than *Bartell*, in that Richardson operated without significant government supervision.  In fact, Richardson apparently operated his ankle monitor business with no input or review from Monroe County.  (Richardson Dep. 23:20-22, 24:9-22, 36:18-37:11).  Further, Monroe County entrusted the entire ankle monitor process to Richardson.  When there was a conflict Richardson, not Monroe County, would refer the inmate to another provider.  (Ford Dep. 30:11-14; Richardson Dep. 27:20-28:10).  The availability of other ankle monitor providers

and the lack of government supervision over Richardson indicates that Richardson was subject to the sort of market pressures that obviate unwarranted timidity even without qualified immunity.

The next consideration is whether withholding qualified immunity from Richardson would "discourage talented candidates from entering public service." *United Pet Supply*, 768 F.3d at 482. "[A] private firm's ability to offset any increased employee liability risk with higher pay or extra benefits can mitigate the concern that individuals will refuse to work on behalf of the government without qualified immunity protection." *Id.* at 482-83 (internal quotation marks omitted) (citation omitted). As a private entity, there appears to be no reason Richardson could not have charged prices sufficient to cover the cost of insurance to offset his risk of liability. In *United Pet Supply v. City of Chattanooga*, the court noted the fact that a non-profit corporation contracting with the city for animal-welfare services which did not indemnify its employees would tend to discourage individuals from entering public service. *United Pet Supply*, 768 F.3d at 482. By contrast, rather than being employed at a large company, Richardson owned and operated his own business. (Richardson Dep. 23:20-22, 24:9-22). It was thus up to Richardson to decide whether to protect himself from liability by purchasing insurance or to charge enough to cover the risk of liability. Withholding qualified immunity under these circumstances would not discourage talented candidates from entering this type of public service.

Finally, the Court must consider whether "denying qualified immunity would lead to distraction from job duties." *United Pet Supply*, 768 F.3d at 482. "[L]awsuits may well distract these employees from their . . . duties, but the risk of distraction alone cannot be sufficient grounds for an immunity." *Id.* (citation omitted). Allowing Cushman's claim to proceed could distract Richardson and other sheriff's deputies from their duties because they may have to participate in

the trial process.  This factor, therefore, weighs in favor of allowing qualified immunity.  However, this factor "does not weigh heavily in the overall calculation."  *Id.*

In sum, there appears to be no firmly rooted history of immunity for private pretrial service providers. Richardson is subject to market pressures to address any fears of unwarranted timidity and withholding qualified immunity from Richardson would not necessarily discourage individuals from public service.  Admittedly, allowing Cushman's suit to proceed would distract some sheriff's deputies from their official duties because they may have to participate in the trial process.  As in *United Pet Supply*, where several factors weighed against each other, when there is no history of immunity or fears of unwarranted timidity by private-sector employees, qualified immunity is not appropriate.  *United Pet Supply*, 768 F.3d at 482.  Accordingly, Richardson may not assert qualified immunity as a defense to the claims asserted against him in his personal capacity.

### ii.      "Clearly Established Right"

Even if Richardson was able to assert a qualified immunity defense, he would not be entitled to immunity because he allegedly violated a clearly established constitutional right.  To determine whether an individual is entitled to qualified immunity, a court must consider:  (i) whether based on applicable law and the facts viewed in the light most favorable to the plaintiff, has a violation occurred, and if so, (ii) whether the constitutional right was "clearly established" at the time of violation.  *Penman*, 2018 WL 6220921, at *8 (citation omitted).  By preventing Cushman from meeting his bond requirements in refusing to provide him with an ankle monitor, Richardson violated Cushman's clearly established right to be free from unjustified detention after his bail was set.  Therefore, even if a qualified immunity defense was potentially available for Richardson, qualified immunity would not be appropriate in this case.

"A right is clearly established if [t]he contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Goodwin v. City of Painesville*, 781 F.3d 314, 325 (6th Cir. 2015) (alterations in original) (internal quotation marks omitted) (citation omitted).  There does not need to be a case with the exact same fact pattern in order for a right to be clearly established; instead, the proper inquiry is "whether the defendants had fair warning that their actions were unconstitutional." *Id.* (internal quotation marks omitted) (citation omitted).  It is thus not necessary that "the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Dodds v. Richardson*, 614 F.3d 1185, 1206 (10th Cir. 2010) (citation omitted).

As discussed above, the right to be free from unjustified detention after bail is set was addressed in *Hurm v. Curry*.  In *Hurm*, the plaintiff's family made several attempts to pay plaintiff's bail, but were not permitted to do so, which resulted in the plaintiff spending several additional days in jail.  *Hurm*, 2011 WL 2940698, at *1.  The Court held that it would be clear to a reasonable jailer that refusing to accept properly tendered money and release a pretrial detainee was unlawful when the incident occurred; thus, the jailer was not entitled to qualified immunity. *Id.* at *4.  In making this determination, the Court relied on *Dodds v. Richardson*, where the plaintiff was not allowed to pay his preset bond until after he was arraigned, resulting in him spending the weekend in jail.  *Dodds*, 614 F.3d at 1189.  The court found that the defendant violated the plaintiff's rights by preventing him from posting bail for no legitimate reason.  *Id.* at 1206; *see also Gaylor v. Does*, 105 F.3d 572, 576 (10th Cir. 1997) (plaintiff has a liberty interest in being freed from detention once his bond was set).

It has likewise long been established that an inmate has a right to a timely release.  In *Traweek v. Gusman*, 414 F. Supp. 3d 847 (E.D. La. 2019), the court found that the plaintiff

properly pleaded that his clearly established constitutional right had been violated when he was kept in jail 20 days after he was sentenced to time-served and was eligible for release from custody. *Id.* at 862-63.  The Court found that "there is no dispute that an incarcerated person's right to timely release from custody is clearly established . . . . "  *Id.* at 862; *see also Jones v. Jackson*, 203 F.3d 875, 880-81 (5th Cir. 2000) (plaintiff had clearly established right to not be detained for nine months without due process).

Refusing to provide Cushman with an ankle monitor to the extent it was Richardson's duty to do so violated Cushman's right to be free from unjustified detention.  Withholding the monitor from Cushman arguably prolonged his incarceration beyond January 8.  In the same way that *Hurm* and *Dodds* attempted to pay their bail and were not allowed, Cushman allegedly attempted to pay Richardson for an ankle monitor so that he could be released in accordance with the judge's court order, but he was not permitted to do so.  Preventing an individual from meeting his court ordered bond requirements would be commonly understood to violate a pretrial detainee's constitutional rights.  Cushman was ready to meet those requirements because he was able and willing to pay for his ankle monitor.  Once he was able to comply with the bond requirements, Cushman had a right to be released timely.  Thus, even if Richardson was able to assert a qualified immunity defense, he would not be entitled to qualified immunity in this case.

### B.   State Law Claims

#### 1.   *Failure to Train/Failure to Supervise*

Cushman asserts Kentucky common law claims against Monroe County for failure to train and failure to supervise.  (Compl. ¶¶ 43-48).  Under Kentucky law, however, counties are "cloaked in sovereign immunity, unless such immunity is expressly waived."  *Patton*, 381 F. Supp. 2d at 602; *Ky. Ctr. for the Arts Corp. v. Berns*, 801 S.W.2d 327, 329 (Ky. 1990) ("Where sovereign

immunity exists by reason of the constitution, the General Assembly may extend or limit waiver as it sees fit, but where no constitutionally protected sovereign immunity exists the General Assembly cannot by statute create it.").  Because Cushman has failed to identify how the Kentucky General Assembly has waived these negligence claims against Monroe County, summary judgment will be granted on these claims.

### 2.    *Infliction of Emotional Distress*

Cushman also asserts a claim for intentional infliction of emotional distress ("IIED").  In Kentucky, the tort of IIED occurs when "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another . . . ."  *Craft v. Rice*, 671 S.W.2d 247, 251 (Ky. 1984) (quoting Restatement (Second) of Torts § 46).  IIED is a "gap-filler" tort that provides "redress for extreme emotional distress where traditional common law actions do not."  *Banks v. Fritsch*, 39 S.W.3d 474, 481 (Ky. App. 2001) (internal quotation marks omitted).  "Where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie."  *Id*.  In these instances, recovery for emotional distress "must be had under the appropriate traditional common law action."  *Id*.

Kentucky allows for recovery for claims of emotional damages from false imprisonment.  *Id.* at 490. False imprisonment is defined as "any deprivation of the liberty of one person by another or detention for however short a time without such person's consent and against his will, whether done by actual violence, threats, or otherwise."  *Id.* at 479.  Additionally, a false imprisonment claim "requires that the restraint be wrongful, improper, or without a claim of reasonable justification, authority or privilege."  *Id*.  Because the claim of false imprisonment

would allow for the recovery of emotional damages and is traditionally applicable to this type of tort, infliction of emotional distress is not an appropriate. *See Michals v. William T. Watkins Mem'l United Methodist Church*, 873 S.W.2d 216, 220 (Ky. App. 1994); *Gross v. Citizens Fidelity Bank-Winchester*, 867 S.W.2d 212, 215 (Ky. App. 1993); *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993).  Therefore, summary judgment is granted for Defendants on Cushman's IIED claim.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.    Defendant Barren County's Motion for Summary Judgment (DN 27) is **GRANTED**, and Plaintiff's claims against Defendant Barren County are **DISMISSED WITH PREJUDICE**.

2.    Defendants Ricky Richardson and Monroe County's Motion for Summary Judgment (DN 27) is **GRANTED IN PART** and **DENIED IN PART**.  All claims against Defendants Monroe County and Ricky Richardson (except Plaintiff's Section 1983 claim against Ricky Richardson, individually) are **DISMISSED WITH PREJUDICE**.

Greg N. Stivers, Chief Judge
United States District Court

March 30, 2022

cc:    counsel of record